IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| ANGELA CRENSHAW, | ) | CASE NO. 1:25-CV-02138-PAG |
| | ) | |
| Plaintiff, | ) | |
| | ) | JUDGE PATRICIA A. GAUGHAN |
| vs. | ) | UNITED STATES DISTRICT JUDGE |
| | ) | |
| COMMISSIONER OF SOCIAL SECURITY ADMINISTRATION, | ) | MAGISTRATE JUDGE |
| | ) | JONATHAN D. GREENBERG |
| | ) | |
| Defendant. | ) | **REPORT AND RECOMMENDATION** |
| | ) | |
| | ) | |

Plaintiff, Angela Crenshaw ("Plaintiff" or "Crenshaw"), challenges the final decision of Defendant, Frank Bisignano,[1] Commissioner of Social Security ("Commissioner"), denying her applications for a Period of Disability ("POD"), Disability Insurance Benefits ("DIB"), and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 416(i), 423, 1381 *et seq.* ("Act"). This Court has jurisdiction pursuant to 42 U.S.C. § 405(g). This case is before the undersigned United States Magistrate Judge pursuant to an automatic referral under Local Rule 72.2(b) for a Report and Recommendation. For the reasons set forth below, the Magistrate Judge recommends that the Commissioner's final decision be VACATED AND REMANDED for further consideration consistent with this opinion.

## I. PROCEDURAL HISTORY

In January and February 2024, Crenshaw filed applications for POD, DIB, and SSI, alleging a disability onset date of August 14, 2023, and claiming she was disabled due to multiple sclerosis and spinal

[1] On May 7, 2025, Frank Bisignano became the Commissioner of Social Security.

lesions. (Transcript ("Tr.") 34, 83.) The applications were denied initially and upon reconsideration, and Crenshaw requested a hearing before an administrative law judge ("ALJ"). (*Id.* at 34.)

On March 4, 2025, an ALJ held a hearing, during which Crenshaw, represented by counsel, and an impartial vocational expert ("VE") testified. (*Id.*) On April 23, 2025, the ALJ issued a written decision finding Crenshaw was not disabled. (*Id.* at 34-51.) The ALJ's decision became final on August 21, 2025, when the Appeals Council declined further review. (*Id.* at 1-6.)

On October 7, 2025, Crenshaw filed her Complaint to challenge the Commissioner's final decision. (Doc. No. 1.) The parties have completed briefing in this case. (Doc. Nos. 6-8.) Crenshaw asserts the following assignments of error:

> (1) The ALJ failed to include or explain the absence of a sit/stand option despite uncontroverted evidence of positional intolerance.
>
> (2) The ALJ failed to account for MS-related fatigue and its impact on sustained work activity.
>
> (3) Sentence Six remand is required for consideration of new and material neuro functional capacity evidence.

(Doc. No. 6.)

## II. EVIDENCE

### A. Personal and Vocational Evidence

Crenshaw was born in June 1993 and was 31 years-old at the time of her administrative hearing (Tr. 34, 49), making her a "younger" person under Social Security regulations. *See* 20 C.F.R. §§ 404.1563(c), 416.963(c). She has at least a high school education. (Tr. 49.) She has past relevant work as a customer service representative benefits clerk and a composite job made up of a nursery school attendant and driver. (*Id*. at 48.)

**B. Relevant Medical Evidence[2]**

In August 2023, Crenshaw went to the hospital for complaints of bilateral lower extremity numbness and tingling for one week, as well as two one-week episodes in June and July 2023 where she had burning/tingling in her right arm and right index/middle finger with decreased grip strength. (*Id.* at 1314-15.) An MRI revealed lesions in her brain. (*Id.* at 1315.) Treatment providers attempted a lumbar puncture, but it was unsuccessful, and Crenshaw was transferred to a different medical center. (*Id.*) On examination, Katrina Geannopoulos, M.D., found 4/5 strength with flexion of the right hip, full strength of all other motor groups, intact sensation to light touch in all extremities, decreased pinprick sensation of the waist area, and decreased vibration sensation in the right lower extremity. (*Id.* at 1314.) Dr. Geannopoulos diagnosed Crenshaw with MS and determined that Crenshaw did not need a lumbar puncture. (*Id.* at 1315.) Crenshaw received IV and oral steroid treatment during her hospital stay. (*Id.* at 1316, 1319.)

On August 31, 2023, Crenshaw saw Shade Greene, M.D., for complaints of interscapular pain that started after her lumbar puncture. (*Id.* at 1305.) On examination, Dr. Greene found normal range of motion and weakness in the right lower extremity. (*Id.* at 1306.) X-rays taken that day were normal. (*Id.* at 1307.) Dr. Greene thought the pain may be from a "[p]ossible small CSF leak, which may resolve on its own," and recommended bed rest and hydration. (*Id.* at 1306.) Dr. Greene instructed Crenshaw to keep her hospital discharge follow-up appointments. (*Id.*)

On September 6, 2023, Crenshaw saw Mary Rensel, M.D., at the Cleveland Clinic Mellen Center for a second opinion regarding her MS. (*Id.* at 608.) Crenshaw reported improved numbness except her ankles were still numb and felt swollen, continued right leg heaviness, feeling off balance, and problems with her right leg dragging when she walked. (*Id.* at 609.) Crenshaw also complained of difficulty staying

---

[2] The Court's recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' Briefs. In addition, since Crenshaw challenges only the ALJ's physical findings, the Court further limits its discussion of the evidence to Crenshaw's physical impairments.

on task and maintaining her train of thought, as well as poor focus. (*Id.*) Crenshaw told Dr. Rensel she was on short-term disability until September 8, 2023. (*Id.*) On examination, Dr. Rensel found full strength, slow rapid movements in the right upper extremity, dysmetria or ataxia, signs of cerebellar dysfunction, absent sensation to light touch and vibration of the distal lower extremities, "mildly diminished" sensation to temperature and pin prick in the bilateral lower extremities, and difficulty with tandem gait. (*Id.* at 612.) Dr. Rensel ordered physical therapy and occupational therapy for Crenshaw's weakness, gait disorder, and hypesthesia and NP testing for Crenshaw's memory complaints. (*Id.* at 612-13.) Dr. Rensel also prescribed Ocrevus. (*Id.* at 613.)

On September 20, 2023, Crenshaw saw Dennis Stenger, PT, for a physical therapy evaluation of her leg weakness and back pain. (*Id.* at 1301-02.) On examination, Stenger found decreased flexibility of the bilateral lower extremities, decreased strength of the core, bilateral hips, and right lower extremity, difficulty with stairs, a slow, antalgic gait with decreased stride and stance, and intact sensation to light and deep touch of the bilateral lower extremities. (*Id.* at 1302-03.)

That same day, Crenshaw saw Dr. Greene for follow up and reported continued but improved right leg weakness and difficulty focusing. (*Id.* at 1299.) She told Dr. Greene she had fallen in her driveway recently because she was "unaware of where her leg was in space." (*Id.* at 1300.) On examination, Dr. Greene found abnormal gait, decreased sensation to light touch in the right plantar and dorsal aspect of the foot, and no motor weakness. (*Id.*) Dr. Greene discussed fall precautions with Crenshaw and noted Crenshaw had an upcoming appointment with neurology. (*Id.*) Dr. Greene further noted Crenshaw had been referred to neuropsychology for memory concerns. (*Id.*)

On October 24, 2023, Crenshaw saw Desiree Chizmadia, APRN, CNP, for complaints of continued back pain since her lumbar puncture that sometimes radiated into her right hip. (*Id.* at 538.) Crenshaw described the pain as aching, although it could be sharp when touched. (*Id.*) Chizmadia noted Crenshaw

had received her first Ocrevus infusion, after which Crenshaw went to the emergency room for complaints of headache. (*Id.*) Crenshaw developed "akathisia reaction" in the emergency room and left against medical advice after receiving 50 mg of Benadryl. (*Id.*) On examination, Chizmadia found 5- to 5/5 strength, normal bilateral upper extremity dexterity and rapid movements, no dysmetria, intact coordination, normal standing balance, and a normal, independent gait. (*Id.* at 540.) Chizmadia thought Crenshaw's back pain was "likely sciatica nerve pain[] from repeated LP attempts." (*Id.* at 541.) Chizmadia continued Ocrevus, increased gabapentin, and started Baclofen and lidocaine patches. (*Id.*)

On December 6, 2023, PT Stenger discharged Crenshaw from physical therapy as she had failed to appear for two appointments and had cancelled three times, for a total of five missed visits. (*Id.* at 1275.)

On December 27, 2023, Crenshaw saw Rachel Butler, APRN, CNP, for a virtual visit regarding her continued back pain and reported feeling worse since her last visit. (*Id.* at 512.) Crenshaw told Butler her back pain occurred when she stood for longer than a few minutes and she needed to sit while cooking. (*Id.* at 513.) Crenshaw described the pain as constant and sharp. (*Id.*) The pain started at the base of her neck and went all the way down to her lower back. (*Id.*) Sitting relieved her pain. (*Id.*) Crenshaw reported that she had tried aqua therapy, gabapentin, lidocaine patches, ibuprofen, and baclofen without relief. (*Id.*) Butler noted the virtual platform prohibited a comprehensive physical examination. (*Id.* at 515.) Butler continued Ocrevus, increased gabapentin to 600 mg, and prescribed a Medrol dose pack. (*Id.*) Butler also continued physical therapy, baclofen, over the counter medication, and lidocaine patches. (*Id.*)

On February 13, 2024, Crenshaw saw Dr. Rensel for a virtual follow up appointment. (*Id.* at 1239.) Crenshaw reported being unable to sit at her desk for eight hours and that her employer was not willing to accommodate her. (*Id.*) Crenshaw endorsed pain in her lower back when sitting for eight hours. (*Id.*) She told Dr. Rensel she had applied for Social Security benefits. (*Id.*) Dr. Rensel noted Crenshaw was "still in PT" for back pain, leg weakness, and leg numbness. (*Id.*) Crenshaw reported falling when getting out of

bed because of right leg weakness and needing to change positions because of pain. (*Id.* at 1240.) She could not sit, stand, or walk for long because of pain. (*Id.*) She also endorsed numbness and tingling of the lower extremities. (*Id.*) Crenshaw told Dr. Rensel she sometimes struggled to find the correct words and she was distractable and forgetful. (*Id.*) She also had more trouble typing and texting, and her fingers would lock or spasm after writing or typing for a while. (*Id.*) She endorsed hand weakness and difficulty opening pill bottles. (*Id.*) Dr. Rensel noted a functional capacity evaluation had been ordered before, but Crenshaw had been unable to schedule it to date. (*Id.*) Dr. Rensel continued Ocrevus and ordered a brain MRI to evaluate disease progression. (*Id.* at 1242-43.) Dr. Rensel also ordered a cervical spine MRI and reordered the functional capacity evaluation. (*Id.* at 1243.)

On February 14, 2024, Crenshaw restarted physical therapy and rated her back pain as a 4/10 that day. (*Id.* at 1261-62.) On examination, PT Stenger found an antalgic gait with decreased stride, a positive straight leg raise test on the right, 3- to 5/5 strength, impaired stair negotiation, impaired transfers, and decreased flexibility. (*Id.* at 1263-64.)

On April 23, 2024, Crenshaw saw PT Stenger for her seventh physical therapy appointment and rated her back pain as a 6/10. (*Id.* at 1921.) On examination, Stenger found decreased gait speed and stride length. (*Id.*)

On August 9, 2024, Crenshaw saw Nurse Chizmadia and reported increased neck stiffness as well as “several occurrences of generalized body aches.” (*Id.* at 2004-05.) Several days before her appointment, Crenshaw experienced an episode where her bilateral arms and torso were painful to the touch for a few days; Crenshaw increased Baclofen and took ibuprofen, which made her pain manageable. (*Id.* at 2005.) Crenshaw also endorsed continued right leg numbness and weakness, which caused difficulty standing and walking for long periods of time. (*Id.*) Her right leg has given out when walking. (*Id.*) Crenshaw also reported increased fatigue, difficulty sleeping at night, misplacing objects, trouble multitasking, and losing

her train of thought. (*Id.*) She stayed active crafting. (*Id.*) On examination, Chizmadia found mild spasticity of all extremities, 5- to 5/5 strength, normal upper extremity dexterity and rapid movements, no dysmetria, intact coordination, normal standing balance, and normal gait. (*Id.* at 2006-07.) Chizmadia increased gabapentin and trazadone and ordered lab work to evaluate for inflammation. (*Id.* at 2007.) Chizmadia also ordered a brain MRI. (*Id.*)

In October 2024, Crenshaw spoke to Alexandra Puskar, R.N., and requested a letter stating she was capable of "less than sedentary work." (*Id.* at 2081.) Puskar told Crenshaw she would forward the request to Crenshaw's provider, but Crenshaw needed to schedule a functional capacity evaluation "to further support the claims of less than sedentary." (*Id.*)

On February 4, 2025, Crenshaw saw Nurse Chizmadia for follow up and reported continued problems with her right leg, including difficulty lifting her leg and constant right hip pain. (*Id.* at 2070.) Crenshaw also complained of increased fatigue, difficulty sleeping because of right hip pain, and difficulty concentrating. (*Id.*) Crenshaw stayed active crafting. (*Id.*) On examination, Chizmadia found mild spasticity of all extremities, 5- to 5/5 strength, normal upper extremity dexterity and rapid movements, no dysmetria, intact coordination, normal standing balance, and normal gait. (*Id.* at 2072.) Chizmadia noted a January 2025 MRI showed two new lesions, but the previous MRI was from 2023 before Crenshaw started Ocrevus. (*Id.* at 2073.) Chizmadia continued Ocrevus and noted an updated brain MRI would be ordered in six months. (*Id.*) She also ordered a right hip x-ray. (*Id.*)

**C. State Agency Reports**

On June 5, 2024, James Cacchillo, M.D., reviewed the file and opined that Crenshaw could occasionally lift and/or carry 20 pounds and frequently lift and/or carry 10 pounds. (*Id.* at 88, 90, 99, 101.) She could stand and/or walk for four hours and sit for about six hours in an eight-hour workday. (*Id.* at 89, 100.) Dr. Cacchillo further opined that Crenshaw could frequently climb ramps and stairs, but never climb

ladders, ropes, or scaffolds. (*Id.*) She could frequently balance, stoop, kneel, and crouch, and occasionally crawl. (*Id.*) She must avoid all exposure to hazards. (*Id.*) She cannot operate moving machinery and must avoid commercial driving and unprotected heights. (*Id.*)

On September 10, 2024, on reconsideration, Steve McKee, M.D., affirmed Dr. Cacchillo's findings. (*Id.* at 110-12, 121-23.)

**D. Hearing Testimony**

During the March 4, 2025 hearing, Crenshaw testified to the following:

- Her last date of physical work was in August 2023. (*Id.* at 62.) She went on short-term and then long-term disability. (*Id.*) Her employer terminated her in February 2024 when her FMLA hours expired. (*Id.*)

- Her twin eight-year-old girls live with her. (*Id.* at 67-68.)

- In August 2023, she became numb from the waist down and went to the hospital. (*Id.* at 64.) The doctor attempted a spinal tap nine times. (*Id.*) Since then, she has "had significant difficulty" with her right leg. (*Id.*) She cannot stand or sit for long periods of time. (*Id.*) She cannot sit on the floor or hard surfaces; if she does, her right leg goes "limp," and she has a hard time trying to get off the floor. (*Id.*) She sits in a chair to prepare food for her children and uses a motorized scooter at the grocery store. (*Id.*) She cannot walk long distances without getting "severe pain or numbness" in her leg. (*Id.*) She went through two rounds of physical therapy and saw no improvement. (*Id.*)

- She can walk for two to three minutes before experiencing pain. (*Id.* at 65.) She can sit upright in a straight-back chair for 10-15 minutes without making any adjustments. (*Id.* at 73.) If she then adjusted her position or stood up, she would not be able to go right back to sitting for the same amount of time. (*Id.*) She cannot sit for at least six hours in an eight-hour workday. (*Id.* at 73-74.)

- She has memory and concentration problems. (*Id.* at 65.) She gets along with people but becomes frustrated and agitated easily. (*Id.*) She can make decisions, but she struggles to remember those decisions. (*Id.*) She cannot remember some of her doctor appointments. (*Id.* at 70.)

- On a typical day, she wakes up and helps get her children to school. (*Id.* at 66.) Most of the time, she helps them get dressed and does their hair at her bedside since she cannot stand to do that. (*Id.*) She goes downstairs and takes something out for dinner. (*Id.*) She uses her computer chair to roll around her house and keeps it nearby in case her legs feel weak. (*Id.* at 67.) She then uses her computer. (*Id.*) She tries to craft, but she ends up starting projects without finishing them because she forgets about them or becomes frustrated that they are not turning out the way she would like. (*Id.*) If she

tries to sit and watch TV, she must constantly switch her weight from one hip to the other; if she sits for too long, her leg goes numb. (*Id.*) If she tries to do the laundry, she cannot go up and down the stairs to the basement, so she will take her tablet down to the basement and will stay down there while the clothes are being washed. (*Id.*) Even then, she must stand for a "quick second" and then sit down again. (*Id.*) By that time, her daughters are getting home from school. (*Id.*) She alternates standing and sitting in the chair while trying to cook dinner, help with homework, and get her daughters ready for bed. (*Id.*) Sometimes she cannot do laundry, and it will get so backed up that she sends it over to a laundry service that cleans and folds it when she is able to afford it. (*Id.* at 69.) When the house needs deep cleaning, her sister or her friend comes over to help because she cannot do it alone. (*Id.*) If she wants to mop downstairs, she must roll the mop and bucket around while she sits in her computer chair. (*Id.*)

- She does not cook big meals because she cannot stand up for long periods of time. (*Id.* at 68.) She buys pre-made things and small things that her children can get and prepare themselves. (*Id.*) For dinner, she rolls around in her computer chair and alternates sitting and standing to prepare the food. (*Id.*) Many times, she puts things in the crockpot because she can dump everything in at once, turn it on, and walk away. (*Id.*)

- There are days where she experiences "extreme fatigue" and even though she wants to be functional, she cannot. (*Id.* at 69.) She gets so tired she can barely keep her eyes open. (*Id.*) Her doctor told her this is a common MS symptom, and she needs to listen to her body and rest. (*Id.*) She almost fell asleep when driving once. (*Id.*) She does drive, but she does not drive long distances. (*Id.* at 69-70.) She experiences severe fatigue at least three days a week. (*Id.* at 72.)

- She can do two chores that last an hour or two at the maximum on a Saturday. (*Id.* at 71.) Driving to the grocery store, getting groceries, driving home, and then putting them away makes her tired, and she is just riding around the store in a scooter. (*Id.*)

- She tried to go back to work, but she got in trouble for being unable to remember call scripts or minor things. (*Id.* at 70.) She cannot sit in the same position for an eight-hour shift. (*Id.* at 71.) She tried at her previous job but needed extra accommodation to get up. (*Id.*) She was told that she could stand up or take breaks, but that would be unpaid. (*Id.*) She then would have a job but no financial benefit since she cannot physically do the work. (*Id.*)

- Her MS may not look bad on paper, but since her diagnosis and failed spinal tap, her daily life has become very difficult. (*Id.* at 68.) Her most recent MRI showed two new brain lesions. (*Id.* at 72.) Her MS symptoms continue to worsen. (*Id.*)

The VE testified Crenshaw had past work as a benefits clerk and a composite job consisting of a nursery school attendant and driver. (*Id.* at 75.) The ALJ then posed the following hypothetical question:

> [P]lease assume a hypothetical individual of the claimant's age and education. Further assume that the individual is limited to the full range of light with the following additional limitations. Climbing ramps and stairs is limited to occasional. Climbing ladders, ropes, or scaffolding is limited to never. Balancing, stooping, kneeling, and crouching are all limited to frequent. Crawling is limited to occasional. The hypothetical individual can never work at unprotected heights and never with moving mechanical parts. The hypothetical individual is able to perform simple routine tasks. Can the hypothetical individual perform any of the past work you described?

(*Id.*)

The VE testified that the hypothetical individual would not be able to perform Crenshaw's past work as a benefits clerk and a composite job consisting of a nursery school attendant and driver. (*Id.* at 76.) The VE further testified the hypothetical individual would be able to perform other representative jobs in the economy, such as marker, cleaner, and inspector and hand packager. (*Id.* at 76-77.)

The ALJ modified the hypothetical to reduce the exertional level to sedentary. (*Id.*) The VE testified that the hypothetical individual would not be able to perform Crenshaw's past work. (*Id.*) The VE further testified the hypothetical individual would be able to perform other representative jobs in the economy, such as order clerk, circuit board assembler, and sorter. (*Id.* at 77.)

## III. STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315, 404.1505(a).

A claimant is entitled to a POD only if the claimant: (1) had a disability; (2) was insured when the claimant became disabled; and (3) filed while the claimant was disabled or within twelve months of the date the disability ended. 42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

A disabled claimant may also be entitled to receive SSI benefits. 20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524 (6th Cir. 1981). To receive SSI benefits, a claimant must meet certain income and resource limitations. 20 C.F.R. §§ 416.1100, 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). *See also Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990). First, the claimant must demonstrate that they are not currently engaged in "substantial gainful activity" at the time of the disability application. 20 C.F.R. §§ 404.1520(b), 416.920(b). Second, the claimant must show that they suffer from a "severe impairment" in order to warrant a finding of disability. 20 C.F.R. §§ 404.1520(c), 416.920(c). A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbot*, 905 F.2d at 923. Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education, or work experience. *See* 20 C.F.R. §§ 404.1520(d), 416.920(d). Fourth, if the claimant's impairment or combination of impairments does not prevent the claimant from doing their past relevant work, the claimant is not disabled. 20 C.F.R. §§ 404.1520(e)-(f), 416.920(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent the claimant from doing their past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled. 20 C.F.R. §§ 404.1520(g), 404.1560(c), 416.920(g).

Here, Crenshaw was insured on the alleged disability onset date, August 14, 2023, and remains insured through September 30, 2026, the date last insured ("DLI"). (Tr. 34-35.) Therefore, in order to be entitled to POD and DIB, Crenshaw must establish a continuous twelve-month period of disability commencing between these dates. Any discontinuity in the twelve-month period precludes an entitlement

to benefits. *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

## IV. SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1. The claimant meets the insured status requirements of the Social Security Act through September 30, 2026.

2. The claimant has not engaged in substantial gainful activity since August 14, 2023, the alleged onset date (20 CFR 404.1571 *et seq*., and 416.971 *et seq*.).

3. The claimant has the following severe impairments: multiple sclerosis and anxiety (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except occasionally climb ramps and stairs; never climb ladders, ropes, or scaffolds; frequently balance, stoop, kneel, and crouch; occasionally crawl; never work at unprotected heights or with moving mechanical parts; and she is able to perform simple and routine tasks.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7. The claimant was born on June **, 1993, and was 30 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8. The claimant has at least a high school education (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569a, 416.969, and 416.969a).

> 11. The claimant has not been under a disability, as defined in the Social Security Act, from August 14, 2023, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 37-51.)

## V. STANDARD OF REVIEW

The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir. 2011). Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-73 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached."). This is so because there is a "zone of choice"

within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g., White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir. 1996)); *accord Shrader v. Astrue*, No. 11-1300, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, No. 1:10-cv-734, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, No. 2:10-CV-017, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-cv-1982, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI. ANALYSIS

In her first assignment of error, Crenshaw challenges the ALJ's RFC assessment for failing to include or explain the absence of a sit/stand option "despite uncontroverted evidence of positional intolerance." (Doc. No. 6 at 4.) Crenshaw argues that the ALJ's failure to address her need to change positions is "[t]he most consequential error in this case." (*Id.*) Crenshaw asserts that the ALJ "failed to clearly articulate why occasional reports of normal coordination, reflexes, muscle strength[,] and range of

motion was inconsistent with [her] allegations that she 'frequently needs to switch positions' and that her 'legs go numb after sitting for too long', especially considering the ALJ acknowledged the episodic nature of Crenshaw's 'medical history of relapsing-remitting multiple sclerosis.'" (*Id.* at 5.) Crenshaw maintains that, in violation of SSR 96-8p, the ALJ's decision lacks any explanation, explicit or implicit, for rejecting the need for a sit/stand limitation or for how any relapses or remissions would affect Crenshaw's ability to sustain work activities on a regular and continuing basis. (*Id.* at 6.) Crenshaw argues that this constitutes harmful error, as "[t]he Sixth Circuit has held that a claimant who cannot tolerate prolonged sitting and must alternate between sitting and standing is not capable of performing the prolonged sitting contemplated by sedentary work." (*Id.*) (citing *Wages v. Sec'y of Health & Human Servs.*, 755 F.2d 495, 498-99 (6th Cir. 1985)).

The Commissioner responds that substantial evidence supports the ALJ's RFC. (Doc. No. 7 at 6.) The Commissioner argues that the ALJ found Crenshaw's subjective symptoms, including needing to change positions, inconsistent with the record, citing evidence in support. (*Id.* at 6-7.) The Commissioner asserts that "by merely pointing to other evidence, without challenging the ALJ's rationale," Crenshaw is asking the Court to reweigh the evidence. (*Id.* at 8.) Furthermore, the Commissioner maintains that "most" of the evidence Crenshaw relies on only shows her subjective complaints, not objective evidence of any impairments. (*Id.*) The Commissioner argues that Crenshaw's argument that the ALJ failed to "adequately explain why the RFC did not include a sit-stand option" should be rejected, as Crenshaw "'expects the ALJ to prove a negative.'" (*Id.* at 9.) While the ALJ must explain the rejection of limitations offered in a medical opinion, Crenshaw's argument "'is untethered to any opinion evidence.'" (*Id.*) (quoting *Snyder v. Comm'r of Soc. Sec.*, No. 3:25-CV-1219, 2026 WL 364319, at *8 (N.D. Ohio Feb. 10, 2026)).

In reply, Crenshaw argues that the "Sixth Circuit has repeatedly held that an ALJ must provide specific reasons, supported by the evidence, for rejecting a claimant's reported limitations, particularly

where those limitations stem from medically determinable impairments." (Doc. No. 8 at 2) (citing *Rogers v. Comm'r of Soc. Sec.*, 486 F,3d 234, 248 (6th Cir. 2007)). Crenshaw asserts that "[a]n ALJ may not rely on isolated normal findings while ignoring evidence of ongoing limitations, particularly in cases involving conditions that are inherently episodic." (*Id.*) (citing *Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 723-26 (6th Cir. 2014)).

The RFC determination sets out an individual's work-related abilities despite his or her limitations. *See* 20 C.F.R. 416.945(a)(1).[3] A claimant's RFC is not a medical opinion, but an administrative determination reserved to the Commissioner. *See* 20 C.F.R. § 416.927(d)(2). An ALJ "will not give any special significance to the source of an opinion on issues reserved to the Commissioner." *See* 20 C.F.R. § 416.927(d)(3). As such, the ALJ bears the responsibility for assessing a claimant's RFC based on all the relevant evidence (20 C.F.R. § 416.946(c)) and must consider all of a claimant's medically determinable impairments, both individually and in combination. *See* SSR 96–8p, 1996 WL 374184 (SSA July 2, 1996).

"In rendering his RFC decision, the ALJ must give some indication of the evidence upon which he is relying, and he may not ignore evidence that does not support his decision, especially when that evidence, if accepted, would change his analysis." *Fleischer*, 774 F. Supp. 2d at 880 (citing *Bryan v. Comm'r of Soc. Sec.*, 383 F. App'x 140, 148 (3d Cir. 2010) ("The ALJ has an obligation to 'consider all evidence before him' when he 'mak[es] a residual functional capacity determination,' and must also 'mention or refute [...] contradictory, objective medical evidence' presented to him.")). *See also* SSR 96-8p, 1996 WL 374184, at *7 (SSA July 2, 1996) ("The RFC assessment must always consider and address medical source opinions. If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted."). While the RFC is for the ALJ to determine, the claimant bears the burden

---

[3] The regulations governing disability insurance benefits and social security income are the same. *See* 20 C.F.R. § 404.1501 *et seq.*; 20 C.F.R. § 416.901 *et seq.*; *see generally Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). For convenience, the Court cites these regulations interchangeably.

of establishing the impairments that determine her RFC. *See Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391 (6th Cir. 1999).

It is well-established there is no requirement that the ALJ discuss each piece of evidence or limitation considered. *See, e.g., Conner v. Comm'r*, 658 F. App'x 248, 254 (6th Cir. 2016) (citing *Thacker v. Comm'r*, 99 F. App'x 661, 665 (6th Cir. May 21, 2004) (finding an ALJ need not discuss every piece of evidence in the record); *Arthur v. Colvin*, No. 3:16CV765, 2017 WL 784563, at *14 (N.D. Ohio Feb. 28, 2017) (*accord*). However, courts have not hesitated to remand where an ALJ selectively includes only those portions of the medical evidence that places a claimant in a capable light and fails to acknowledge evidence that potentially supports a finding of disability. *See e.g., Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 724 (6th Cir. 2014) (reversing where the ALJ "cherry-picked select portions of the record" rather than doing a proper analysis); *Germany–Johnson v. Comm'r of Soc. Sec.*, 313 F. App'x 771, 777 (6th Cir. 2008) (finding error where the ALJ was "selective in parsing the various medical reports"). *See also Ackles v. Colvin*, No. 3:14cv00249, 2015 WL 1757474, at *6 (S.D. Ohio April 17, 2015) ("The ALJ did not mention this objective evidence and erred by selectively including only the portions of the medical evidence that placed Plaintiff in a capable light."); *Smith v. Comm'r of Soc. Sec.*, No. 1:11-CV-2313, 2013 WL 943874, at *6 (N.D. Ohio March 11, 2013) ("It is generally recognized that an ALJ 'may not cherry-pick facts to support a finding of non-disability while ignoring evidence that points to a disability finding.'"); *Johnson v. Comm'r of Soc. Sec.*, No. 2:16-cv-172, 2016 WL 7208783, at *4 (S.D. Ohio Dec. 13, 2016) ("This Court has not hesitated to remand cases where the ALJ engaged in a very selective review of the record and significantly mischaracterized the treatment notes.").

When a claimant alleges symptoms of disabling severity, the ALJ must follow a two-step process for evaluating these symptoms. *See e.g., Massey v. Comm'r of Soc. Sec.*, 409 F. App'x 917, 921 (6th Cir. 2011). First, the ALJ must determine if there is an underlying medically determinable physical or mental

impairment that could reasonably be expected to produce a claimant's symptoms. Second, the ALJ "must evaluate the intensity and persistence of [the claimant's] symptoms so that [the ALJ] can determine how [those] symptoms limit [the claimant's] capacity for work." 20 C.F.R. § 404.1529(c)(1). *See also* SSR 16-3p,[4] 2016 WL 1119029 (March 16, 2016).

If these claims are not substantiated by the medical record, the ALJ must make a credibility[5] determination of the individual's statements based on the entire case record. Credibility determinations regarding a claimant's subjective complaints rest with the ALJ. *See Siterlet v. Sec'y of Health & Human Servs*., 823 F.2d 918, 920 (6th Cir. 1987); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 248 (6th Cir. 2007) (noting that "credibility determinations regarding subjective complaints rest with the ALJ"). The ALJ's credibility findings are entitled to considerable deference and should not be discarded lightly. *See Villareal v. Sec'y of Health & Human Servs*., 818 F.2d 461, 463 (6th Cir. 1987). Nonetheless, the ALJ's "decision must contain specific reasons for the weight given to the individual's symptoms ... and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." SSR 16-3p, 2016 WL 1119029; *see also Felisky*, 35 F.2d at 1036 ("If an ALJ rejects a claimant's testimony as incredible, he must clearly state his reason for doing so").

To evaluate the "intensity, persistence, and limiting effects of an individual's symptoms," the ALJ must look to medical evidence, statements by the claimant, other information provided by medical sources, and any other relevant evidence on the record. *See* 20 C.F.R. § 404.1529; SSR 16-3p, 2016 WL 1119029

---

[4] SSR 16-3p superseded SSR 96-7p, 1996 WL 374186 (July 2, 1996) on March 28, 2016. Thus, SSR 16-3 was in effect at the time of the March 4, 2025 hearing.

[5] SSR 16-3p has removed the term "credibility" from the analysis. Rather, SSR 16-3p directs the ALJ to consider a claimant's "statements about the intensity, persistence, and limiting effects of the symptoms," and "evaluate whether the statements are consistent with objective medical evidence and other evidence." SSR 16-3p, 2016 WL 1119029, at *6. The Sixth Circuit has characterized SSR 16-3p as merely eliminating "the use of the word 'credibility' ... to 'clarify that subjective symptom evaluation is not an examination of an individual's character.'" *Dooley v. Comm'r of Soc. Sec*., 656 F. App'x 113, 119 n.1 (6th Cir. 2016).

(March 16, 2016). Beyond medical evidence, there are seven factors that the ALJ should consider.[6] The ALJ need not analyze all seven factors but should show that he considered the relevant evidence. *See Cross*, 373 F. Supp. 2d at 733; *Masch v. Barnhart*, 406 F. Supp. 2d 1038, 1046 (E.D. Wis. 2005).

The ALJ acknowledged Crenshaw's testimony that she had "difficulty standing for long periods of time," "she frequently needs to switch positions," "her legs go numb after sitting for too long," and she has "difficulty sitting at her desk." (Tr. 41-42.)

In the RFC analysis, the ALJ found as follows:

> The claimant **had some weakness in the right lower extremity**, which was noted to be the claimant's baseline (4F/276; 5F/4). **She had decreased sensation to light touch in the bilateral lower extremities** (6F/53, 465) and **decreased sensation to vibration in the right lower extremity** (6F/70). She **ambulated with an antalgic** (6F/16, 365) and **abnormal gait** (6F/63). The claimant had **decreased flexibility in both lower extremities, impaired gait, difficulty with stairs, and decreased strength in the core, hips, and right lower extremity** (6F/465). The claimant also had **decreased gait speed and stride length** (11F/7; 12F/12). At times, the claimant's ease of laryngeal movement was mildly impaired, and she was tender in the thyrohyoid space (6F/110). She had mild tension in the face and neck (6F/110). **The claimant's physical examination findings were generally unremarkable throughout the record** (4F/252; 6F/20, 37, 59, 87, 123, 148). The claimant's coordination was normal (4F/384). Her reflexes were normal and symmetric (4F/384). **The claimant's sensation was intact to all extremities** (4F/276). **She had intact muscle strength in the upper and lower extremities** (6F/148). There was no dysarthria or aphasia (4F/276). The claimant's lumbar flexion and extension were within normal limits (6F/365).
>
> This evidence supports physical functional limitations, but not to the extent alleged.

---

[6] The seven factors are: (1) the individual's daily activities; (2) the location, duration, frequency, and intensity of the individual's pain; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; (6) any measures other than treatment the individual uses or has used to relieve pain or other symptoms; and (7) any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms. *See* SSR 16-3p, 2016 WL 1119029, at *7; *see also Cross v. Comm'r of Soc. Sec.*, 373 F. Supp. 2d 724, 732–733 (N.D. Ohio 2005) (stating that an ALJ, in a unified statement, should explain his or her credibility findings in terms of the factors set forth in the regulations, thereby permitting the court to "trace the path of the ALJ's reasoning.")

> * * *
>
> After careful consideration, the undersigned finds that the claimant's allegations are not entirely consistent with the evidence of record. The claimant's impairments could reasonably be expected to produce the alleged symptoms, but the intensity of the symptoms and impact on functioning are not consistent with the totality of the evidence. While the record reflects that the claimant has some degree of limitations related to her multiple sclerosis, the examination findings do not support limitations beyond the above residual functional capacity assessment**. Aside from some findings as to gait (6F/16, 63, 365, 465; 11F/7; 12F/12); lower extremity weakness (4F/276; 5F/4); decreased sensation (6F/53, 70, 365); and decreased range of motion (6F/465), the claimant's physical examination findings were generally unremarkable throughout the record** (4F/252; 6F/20, 37, 59, 87, 123, 148). The claimant's coordination was normal (4F/384). Her reflexes were normal and symmetric (4F/384). **For example, her sensation was intact to all extremities** (4F/276). **She had intact muscle strength in the upper and lower extremities** (6F/148). There was no dysarthria or aphasia (4F/276). The claimant's lumbar flexion and extension were within normal limits (6F/365). These examination findings are consistent with the above residual functional capacity assessment.

(*Id.* at 43-44) (emphasis added).

The Court finds that the ALJ erred in the RFC analysis by failing to build an accurate and logical bridge from the evidence to the ALJ's conclusions. The ALJ rejected Crenshaw's subjective complaints because her "physical examination findings were generally unremarkable throughout the record." (*Id.* at 43-44.) However, the evidence included in the ALJ's decision is mixed, and without any further explanation, belies the ALJ's conclusion that overall, Crenshaw's examination findings were normal and that she could perform a limited range of sedentary work. (*Id.*) The "normal" findings on which the ALJ relies to discredit Crenshaw's subjective complaints span the time frame of November 2022 (predating the alleged disability onset date by almost a year) to January 2024, with most of the records dating from August to October 2023. (*Id.* at 43.) In contrast, the records containing the findings supporting disability span the time frame of August 2023 to April 2024, with most of the records dating from February to April 2024. (*Id.*) Indeed, at a physical therapy appointment on February 14, 2024, PT Stenger found an antalgic gait with decreased stride, a positive straight leg raise test on the right, 3- to 5/5 strength, impaired stair

negotiation, impaired transfers, and decreased flexibility. (*Id.* at 1263-64.) Therefore, it appears Crenshaw's condition worsened over time. Furthermore, the Court agrees with Crenshaw that it is unclear from the ALJ's decision how many of the normal findings discussed by the ALJ, such as intact sensation, normal coordination, and intact reflexes, undercut her testimony that she cannot sit for long periods of time without her legs going numb and that she needs to alternate positions.

The ALJ's decision also omits other relevant contrary examination findings in the record, including slow rapid movements in the right upper extremity, dysmetria or ataxia, and signs of cerebellar dysfunction (*id.* at 612), a positive straight leg raise test (*id.* at 1263), and mild spasticity of all extremities (*id.* at 2006, 2072). As explained in detail above, if relevant evidence is not mentioned, the Court cannot discern whether the ALJ discounted or overlooked the evidence. *Shrader*, 2012 WL 5383120, at *6. Nor may an ALJ overlook or ignore contrary lines of evidence.

As the undersigned recommends remand on these grounds, and in the interest of judicial economy, the undersigned does not reach Crenshaw's other assignments of error.

## VII. CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends that the Commissioner's final decision be VACATED AND REMANDED for further consideration consistent with this opinion.

Date: September 1, 2026

*s/ Jonathan Greenberg*
Jonathan D. Greenberg
United States Magistrate Judge

## OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document. Failure to file objections within the specified time may forfeit the right to appeal the District Court's order. *Berkshire v. Beauvais*, 928 F.3d 520, 530-31 (6th Cir. 2019).**